917 F.2d 235
 14 UCC Rep.Serv.2d 135, Prod.Liab.Rep.(CCH)P 12,664
 Janet MILES, etc., et al., Plaintiffs-Appellants (89-3594),
Plaintiffs (89-3595/3604/3605),
Michael Glass, etc., et al., Plaintiffs-Appellants
(89-3595), Plaintiffs (89-3594),
Betty S. Underwood, et al., Plaintiffs-Appellants (89-3605),
v.
KOHLI & KALIHER ASSOCIATES, LTD., Defendants,
Paulding County Road Commission (Board of County
Commissioners of Paulding County, Ohio),
Defendant-Appellant (89-3604),
United States Steel Corporation, et al., Defendants-Appellees,
Ohio Bridge Corporation, Defendant (89-3594/3604),
Defendant-Appellee (89-3594/3605).
 
 Nos. 89-3594, 89-3595, 89-3604, 89-3605.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 11, 1990.
Decided Oct. 22, 1990.
 William J. Lamping, Bloomfield Hills, Mich., Richard M. Kerger (argued), Marshall & Melhorn, Toledo, Ohio, for plaintiffs-appellants in No. 89-3594.
 Jeffrey S. Creamer (argued), David W. Wicklund, Shumaker, Loop & Kendrick, Toledo, Ohio, for defendants-appellees in Nos. 89-3594, 89-3604, 89-3595 and 89-3605.
 Martin W. Williams, Williams, Jilek & Lafferty, Toledo, Ohio, Glenn H. Troth, Paulding, Ohio, Richard M. Kerger (argued), Marshall & Melhorn, Toledo, Ohio, for plaintifs-appellants in No. 89-3595.
 Richard D. Rogovin, Bricker & Eckler, Columbus, Ohio, for Ohio Bridge Corp. in No. 89-3595 and 89-3605.
 Michael J. Malone, Julie A. Davenport, Oxley, Malone, Fitzgerald & Hollister, Findlay, Ohio, for Paulding County Road Com'n in No. 89-3604.
 Richard M. Kerger (argued), James H. Irmen, Jessica R. Christy, Marshall & Melhorn, Toledo, Ohio, for Betty S. Underwood in No. 89-3605.
 Richard M. Kerger, Ruth A. Meacham, James H. Irmen, Jessica R. Christy, Marshall & Melhorn, Toledo, Ohio, for George William Underwood in No. 89-3605.
 Before MARTIN and GUY, Circuit Judges, and GILMORE, District Judge.*
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 This is an appeal from summary judgment in favor of three defendants, United States Steel Corporation (USS), American Culvert and Fabricating Company, and Ohio Bridge Corporation, in an action for compensatory and punitive damages stemming from the collapse of the Zuber Creek bridge in Paulding County, Ohio.
 
 
 2
 Appellants maintain that summary judgment was inappropriate because the record contains facts sufficient to support recovery against USS and American Culvert on the basis of strict liability, negligent failure to warn, breach of the duty to instruct, negligent design, tortious breach of express warranty, and breach of a contractually implied warranty. In addition, they maintain that Ohio Bridge may be held liable for actions performed by American Culvert on an "alter ego" theory. For reasons set forth below, we find that summary judgment in favor of USS and American Culvert on claims of strict liability, negligent failure to warn, and breach of the duty to instruct must be reversed. We affirm the district court's disposition of the remaining issues.
 
 I.
 
 3
 In the spring of 1972, the Paulding County Engineer, Charles Dunakin, in consultation with the County Board of Commissioners, decided to replace the old steel truss bridge carrying County Road 180 over Zuber Creek. Relying on his years of experience as the county's engineer, Dunakin chose a culvert design for the new bridge. Bridges of the culvert design Dunakin selected consist of two essential elements: a metal arch through which water can flow, and earthen "backfill" which surrounds the arch and supports the roadway above. After determining the dimensions of the culvert he would require and consulting a data sheet on arches, Dunakin finally decided to purchase a "bridge kit" manufactured by USS. The kit included interlocking sections of corrugated steel plates along with all hardware necessary to assemble the plates into a semi-cylindrical arch 96 feet long with a 30-foot span and 15-foot one-inch rise. It also contained a set of standardized blueprints and instructions on assembling the arch and backfilling soil around it so as to form a culvert. At no time during the selection process did Dunakin consult with USS regarding the type of arch to use or the specifications he would require.
 
 
 4
 After Dunakin decided to purchase the USS bridge kit, Paulding County extended invitations for bids from "retailers" on the price of the kit as delivered to the Zuber Creek site. American Culvert submitted the lowest bid and was awarded the contract in April of 1972. After purchasing the kit from AmBridge, a subdivision of USS, American Culvert delivered it directly to the county in May of 1972.
 
 
 5
 Paulding County then proceeded to construct the culvert without any direct assistance from USS or American Culvert. A county work crew began construction in the fall of 1973 by sinking concrete footings into channels on the sides of the creek. They then fabricated the arch, bolting together the corrugated steel plates supplied by USS, and placed it in the footings. Headwalls, concrete structures formed to the contour of the arch, were then placed on each of the arch's four corners, and the crew finally began the process of backfilling.
 
 
 6
 The bridge kit was designed so that the completed culvert would derive most of its stability and capacity to support weight not from the flexible corrugated sectional plates composing the arch, but from the "passive resistance" of the soil surrounding it. In fact, when a culvert bridge of the design employed here has been properly backfilled, virtually the entire weight of any load placed upon it will be deflected into the surrounding soil. The instructions accompanying the bridge kit stated that "it is necessary that backfill be made of good material properly placed and carefully compacted." They also directed that "[s]elected drainable backfill material is preferred, but most local fill material can be used provided it is carefully placed and compacted." In fact, the work crew did use local soil, which, in Paulding County, is composed primarily of clay. Although it appears that some attempt was made to follow the USS instructions on soil compaction, there were numerous significant deviations. After the backfilling was completed, gravel was placed over the culvert to bring it to the height of the road, and a new highway surface consisting of two and one-half inches of asphalt was laid down.
 
 
 7
 Two years after the culvert was completed, during the summer of 1975, Dunakin inspected the structure and noticed that the arch had deflected slightly inward and had pulled back somewhat from the headwalls. The following year, Daniel Stouffer, who had succeeded Dunakin as Paulding County Engineer, again inspected the bridge. Concerned about the movement of the arch, he informed American Culvert of a potential problem and requested assistance. American Culvert then called William Wells, the USS Product Manager. On August 3, 1976, acting pursuant to a USS policy to follow up on any complaints concerning its products, Wells examined the culvert in the company of a county employee. He noticed that the road surface on both sides of the bridge had been patched, indicating prior subsidence of the backfill. He further observed that the arch appeared to be flattening at the ten o'clock and two o'clock positions.
 
 
 8
 Following his inspection, Wells returned to the County Engineer's office and apparently informed Stouffer that continued movement of the arch could eventually lead to the collapse of the culvert.[1] Wells advised Stouffer to take periodic measurements of the culvert, and informed him that if movement continued or the arch began to buckle, the clay backfill would have to be removed, proper arch geometry restored, and more stable backfill properly inserted and compacted. A few days later, Wells memorialized the essence of his observations and instructions in a letter to American Culvert.
 
 
 9
 Based on Wells' recommendations, county workers took measurements of the bridge in August, October, and November of 1976. When the third measurement deviated only slightly from the second, Stouffer concluded that the structure had stabilized and therefore discontinued the measurements. Apparently Stouffer was incorrect in his conclusion, and the structure continued to shift.[2] It now appears that the shifting was due primarily to the use of local clay as backfill.
 
 
 10
 Beginning in 1978, the engineering firm of Kohli & Kaliher contracted with Paulding County to inspect all of its 210 bridges. In its report for that year, Kohli & Kaliher found the Zuber Creek bridge to be in "good condition--no repair necessary," and noted none of the conditions previously observed by Dunakin, Stouffer, and Wells. The reports for 1979 through 1981 did record some deflection of the arch and gapping between the arch and headwalls. In its 1982 report, Kohli & Kaliher recorded a large crack in the roadway above the center line of the culvert, along with increased movement from the headwalls and buckling of the arch. Following this report, Paulding County contacted a contractor to inquire about the possibility of shoring up the arch with shotcrete. Upon inspection, the contractor observed that the top of the arch had peaked approximately one foot above its original position. Unfortunately, the culvert collapsed before repairs could be made, causing nine motorists travelling along County Road 180 to plunge into the wreckage below.
 
 II.
 
 11
 The plaintiffs in this action consist of four persons who were injured in the collapse and the estates of the remaining five who lost their lives. Each plaintiff filed a separate suit in either the Paulding County Court of Common Pleas or the United States District Court for the Northern District of Ohio. The same five defendants were named in each action: USS; American Culvert; Ohio Bridge, a corporation fully owned by American Culvert's shareholders; Paulding County; and Kohli & Kaliher Associates. Each defendant has filed cross-claims, counterclaims, and/or third-party complaints against all the other named defendants.[3]
 
 
 12
 American Culvert subsequently filed a petition for protection under Chapter 11 of the Bankruptcy Code, whereupon all the individual cases were consolidated in federal court. On December 11, 1984, the court granted summary judgment in favor of one defendant, Ohio Bridge.[4]
 
 
 13
 Following extensive discovery, USS and American Culvert filed a motion for summary judgment in February of 1986. The court granted the motion on June 2, 1986, thereby dismissing all claims against both defendants. We permitted appeal under Fed.R.Civ.P. 54(b) because the judgment resolved all claims pending against defendants American Culvert and USS.[5]
 
 
 14
 In an unpublished decision released in January of 1988, Miles v. Paulding County Road Commissioners, 837 F.2d 476 (6th Cir.1988), we affirmed the district court's judgment in part, reversed in part, and remanded the case for further proceedings.[6] On remand, defendants USS and American Culvert again moved for summary judgment. The court granted the motion on March 27, 1989, and denied subsequent motions for reconsideration.
 
 
 15
 All plaintiffs had, by this time, negotiated settlement agreements with Paulding County, leaving Kohli & Kaliher as the sole remaining defendant. After the plaintiffs' motions for reconsideration were denied, the remaining parties filed a stipulation for voluntary dismissal without prejudice as to Kohli & Kaliher, rendering the court's December 11, 1984, and March 27, 1989, orders final and appealable. The plaintiffs and Paulding County (hereinafter referred to collectively as "appellants") then filed a timely notice of appeal.
 
 III.
 
 16
 As noted above, appellants rely on six legal theories to support their argument that summary judgment was improper: (1) strict liability, (2) negligent failure to warn, (3) breach of the duty to instruct, (4) negligent design, (5) tortious breach of express warranty, and (6) breach of a contractually implied warranty. In addition, the estate of the Underwoods continues to argue that Ohio Bridge may be held liable for all actions performed by American Culvert on an "alter ego" theory. We address each claim of error in turn to determine whether summary judgment was properly granted.
 
 
 17
 Summary judgment is appropriate only when "the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial." Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987). In examining the record to determine whether a genuine issue of material fact exists, the district court must review all evidence in the light most favorable to the nonmoving party, and "all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).
 
 
 18
 A party bearing the burden of proof at trial may not evade his obligation to adduce evidence by "simply show[ing] that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (citations omitted). As the Supreme Court explained in Liberty Lobby, a dispute about a material fact is "genuine" within the meaning of Rule 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 477 U.S. at 248, 106 S.Ct. at 2510.
 
 
 19
 This court reviews a district court's grant of summary judgment de novo, McKee v. Cutter Laboratories, Inc., 866 F.2d 219, 220 (6th Cir.1989); Storer Communications, Inc. v. National Ass'n of Broadcast Employees & Technicians, AFL-CIO, 854 F.2d 144, 146 (6th Cir.1988), albeit with the understanding that "the judgment of a local district judge sitting in a diversity case, as to the application of state law, is entitled to considerable deference." Diggs v. Pepsi-Cola Metro. Bottling Co., 861 F.2d 914, 927 (6th Cir.1988) (citations omitted).
 
 
 20
 In deciding the questions presented, we follow the law of Ohio as announced by that state's supreme court. See Commissioner v. Estate of Bosch, 387 U.S. 456, 462-66, 87 S.Ct. 1776, 1781-83, 18 L.Ed.2d 886 (1967); Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue. Bailey v. V & O Press Co., 770 F.2d 601, 604 (6th Cir.1985).
 
 A. Strict Products Liability Claims
 
 21
 As presented by the parties, the argument over plaintiffs' strict products liability claims is primarily a dispute as to the effect of our January 1988 decision. The district court read the opinion to have fully addressed and disposed of all strict liability claims raised below, including those based on allegations of a manufacturing defect in the arch and those based on defects in the design of the bridge kit. While acknowledging that we held no manufacturing defect existed in the arch, appellants argue that strict liability claims grounded on a defective design theory remain viable.
 
 
 22
 The "law of the case" doctrine holds that once an appellate court has ruled on a particular issue, absent exceptional circumstances, the ruling is final and must be followed by the district court on remand.[7] Coal Resources, Inc. v. Gulf & Western Indus., 865 F.2d 761, 767 (6th Cir.1989); Petition of United States Steel Corp., 479 F.2d 489, 493-94 (6th Cir.), cert. denied, 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973). Our first task, therefore, is to determine exactly which issues of strict liability were conclusively resolved by our decision, and which, if any, remained to be considered by the district court.
 
 
 23
 Section B of our prior opinion opens with the following unambiguous statement:
 
 
 24
 [W]e ... uphold the grant of summary judgment as to the strict products liability claims. Our review of the record convinces us that defendants cannot be held liable under this theory as a matter of law.
 
 
 25
 Miles v. Paulding County Rd. Comm'rs, slip op. at 18. After explaining that Ohio law requires a plaintiff to show that his or her injury was caused by a defect in order to recover on a strict liability claim, we noted that the plaintiffs in this case had alleged two theories of product defect: first, that the arch was too flexible for its reasonably intended use; and, second, that USS' instructions concerning construction of a culvert around the arch failed to stress the critical importance of using proper backfilling material and of fully compacting that material.
 
 
 26
 We disposed of the first argument by finding the flexibility of the arch irrelevant to the strength or integrity of the completed culvert. We concluded our treatment of this argument with the statement that "the evidence cannot, as a matter of law, support a finding that the arch contained any manufacturing defect in existence at the time it left defendant's hands." Id. at 21.
 
 
 27
 Turning to the plaintiffs' second strict liability argument, that USS gave inadequate warnings or failed to properly instruct, we explained that these allegations do not give rise to a strict liability cause of action under Ohio law, and that if claims based on failure to instruct or warn were cognizable at all in this case, it would be under a negligence theory. Finally, we summarized our holding in the concluding paragraph of our opinion, writing: "summary judgment is granted to [USS and American Culvert] as a matter of law as to all pending products liability claims." Id. at 26.
 
 
 28
 There is no ambiguity as to the purport of this decision--simply stated, we disposed of "all pending products liability claims." Accordingly, the district court correctly held that our earlier opinion foreclosed further consideration of claims grounded in strict products liability regardless of the type of defect alleged.
 
 
 29
 Our inquiry is not at an end, however, because since we issued our decision the Ohio Supreme Court has overruled the line of cases upon which we relied in holding that a claim of inadequate warning was not cognizable in strict liability.[8] In Crislip v. TCH Liquidating Co., 52 Ohio St.3d 251, 556 N.E.2d 1177 (1990), the court explained that "a product may be unreasonably dangerous and strict liability may apply as the result of the lack of an adequate warning even though the product has no design or manufacturing defect." Id. at 255, 556 N.E.2d 1177. It is apparent, therefore, that we erred in affirming summary judgment on the plaintiffs' inadequate warning claims against USS and American Culvert grounded in strict liability. On remand, these claims must be addressed in accordance with the law of Ohio as set out in Crislip. We now proceed to consider the negligence claims on appeal.
 
 B. Negligence Claims Against USS
 
 30
 Appellants assert that the record contains facts sufficient to support recovery against both defendants on three related negligence theories. First, appellants maintain that USS and American Culvert breached a duty to instruct Paulding County on the proper method of backfilling the culvert. Second, they claim that the defendants negligently failed to warn Paulding County that a culvert built around the arch could collapse if the backfill were improperly compacted or if it were composed of unstable material such as clay. And finally, appellants argue for the viability of a distinct claim for "negligent design" of the bridge kit.
 
 
 31
 The district court dealt with the negligent failure to instruct and failure to warn claims together. Proceeding from the premise that the arch was "only one component of the bridge structure," it cited a case from the Ohio Court of Appeals, Searls v. Doe, 29 Ohio App.3d 309, 505 N.E.2d 287 (1986), for the proposition that "[u]nder Ohio law, the manufacturer of a component part of a system has no duty to warn of dangers in the system as a whole when the component part is not in and of itself defective and is made in accordance with specifications." Miles v. Kohli & Kaliher Assoc., Ltd., No. C 83-325, slip op. at 4 (N.D.Ohio, Mar. 27, 1989). After reviewing our decision that the arch contained no defects and was made according to the specifications that USS had supplied to Paulding County, the court granted summary judgment on both the failure to warn and the inadequate instruction claims. The negligent design claim was rejected sub silentio.
 
 
 32
 Finding the district court's disposition of the negligence claims unpersuasive, we undertake our own analysis below. The focus of our inquiry here is on the viability of appellants' negligence claims against USS; the propriety of summary judgment against American Culvert will be addressed separately below.
 
 
 33
 In order to establish an action for negligence under Ohio law, a plaintiff must show that the defendant owed him a duty, that the duty was breached, and that his injury proximately resulted from the breach. Jeffers v. Olexo, 43 Ohio St.3d 140, 539 N.E.2d 614, 616 (1989); Menifee v. Ohio Welding Products, Inc., 15 Ohio St.3d 75, 472 N.E.2d 707, 710 (1984). As more than one court has noted, these apparently straightforward elements "become elusive when applied to varying concrete factual situations." Hughes v. American Jawa, Ltd., 529 F.2d 21, 23 (8th Cir.1976), quoted in Gracyalny v. Westinghouse Elect. Corp., 723 F.2d 1311, 1316-17 (7th Cir.1983) (concluding that summary judgment in tort actions is therefore disfavored); see also May v. Parke, Davis & Co., 142 Mich.App. 404, 411, 370 N.W.2d 371 (1985) (same). Nevertheless, we will attempt to deal with each element of the negligence claims separately where possible.
 
 1. The Duty to Instruct or Warn
 
 34
 A manufacturer or vendor of a product owes a duty to exercise reasonable care in the design, manufacture, and marketing of the product so as to avoid injuring foreseeable users and third persons. See Temple v. Wean United, Inc., 50 Ohio St.2d 317, 364 N.E.2d 267 (1977). The precautions necessary to satisfy the duty of ordinary care will, of course, vary depending on the facts of each case. When use of a product might foreseeably result in severe injury, and the product can easily be made safe, a manufacturer will escape liability only by modifying the design so as to eliminate the danger. In other circumstances, when the potential for injury can be reduced by attaching instructions or a warning, reasonableness may demand that the product be accompanied by appropriate explanatory or cautionary language. See Hargis v. Doe, 3 Ohio App.3d 36, 443 N.E.2d 1008 (1981). The appellants contend that the bridge kit falls into the latter category and that the defendants were negligent in failing to include proper instructions and warnings. Before we review the adequacy of the precautions actually taken, however, we must address the district court's determination that the Searls line of cases absolves the defendants of any duty to warn due to their status as component part manufacturers.
 
 
 35
 We turn first to Temple v. Wean, the Ohio Supreme Court's decision upon which the Searls court based its ruling. In Temple, the plaintiff was injured by a mechanical press that was accidentally activated when a falling object came to rest simultaneously on its two operating buttons. After adopting section 402A of the RESTATEMENT (SECOND) OF TORTS, the court went on to consider whether the manufacturer of the operating button mechanism could be held strictly liable for failing to warn the press manufacturer that accidental depression of the buttons could result in injury to the operator. The court noted that the American Law Institute had expressed "no opinion" in section 402A as to whether a seller of a component part could be held strictly liable for a defect in an assembled product. In order to resolve this ambiguity, the court then wrote:
 
 
 36
 [T]he obligation that generates the duty to warn does not extend to the speculative anticipation of how manufactured components, not in and of themselves dangerous or defective, can become potentially dangerous dependent upon the nature of their integration into a unit designed and assembled by another.
 
 
 37
 364 N.E.2d at 272. Having determined that the plaintiffs had no strict liability claim, the court went on to consider whether they could be held liable for negligence. After explaining that the purchasers of the machine had moved the operating buttons from a safe vertical position to a dangerous horizontal one, the court stated, "[i]t is evident that [the defendants] did not know, nor could they have known, of a defect that was created by a subsequent purchaser. Therefore, they cannot be held liable under the theory of negligent failure to warn." 364 N.E.2d at 273. Insofar as the case is relevant to negligence actions, therefore, Temple simply states that a component part manufacturer's failure to warn of a dangerous condition that it did not create and could not have anticipated does not constitute a breach of the duty of care.
 
 
 38
 In Searls, the court of appeals appears to have extracted a more general principle from the supreme court's holding. In that case, the plaintiff was injured when a beer can filling line on which he was working began to reject cans at a high rate of speed. He sued the manufacturers of the production line and the filling device, alleging, inter alia, that they had negligently failed to warn of the potential dangers of the line. The court found that the defendants had made their products "in accordance with rigid and exhaustive specifications" laid out by the beer bottler, and that the defendants had been required to "guaranty in writing that the equipment furnished [would] meet all requirements" of the bottler's design. 505 N.E.2d at 289. Under these circumstances, the court explained, it would be unreasonable to require the defendants "to procure plans of the entire system, review those plans, and independently determine whether their respective component parts would function in a safe fashion." Id. Therefore, "where defendants were not responsible for the design and manufacture of the entire system and where the component parts, not in and of themselves dangerous or defective, were manufactured in accordance with specifications," no duty to warn was breached. 505 N.E.2d at 290.
 
 
 39
 The final case in this line is Williams v. Morgan Adhesives Co., No. CV 84-10-3183 1988 WL 40376 (9th App.Dist., April 27, 1988), an unpublished decision of the Ohio Court of Appeals. In Williams, the plaintiff was injured when his arm was drawn in between two rollers on a machine used to apply adhesive to plywood boards. The plaintiff sued the manufacturer of the machine's drive system, claiming that it ought to have warned the final machine assembler of the danger the machine would pose to workers. The court affirmed summary judgment for the defendant after finding that its engineers were "unaware of the final assembly or overall operation of the machine. Their drawings of the electrical drive system bear no resemblance whatsoever to the actual set up of the machine." Id., slip op. at 7. The court explained that, under these circumstances, it would be unreasonable to expect the defendants to anticipate all possible uses for the drive mechanism and to warn against the dangers posed by each.
 
 
 40
 While we have no quarrel with the district court's characterization of the arch as a "component part" of the culvert, we find the decisions discussed above easily distinguishable from the case now before us. In Temple, the court found no negligence in a component part manufacturer's failure to warn of a dangerous condition created by a purchaser's modification of a product when that modification could not have been anticipated by the manufacturer. In the case at bar, by contrast, the arch was deployed in substantially the manner suggested by USS' instructions. Even if the use of clay as a backfill material or the failure to properly compact the soil could be considered "modifications" of the culvert, they were hardly unforeseeable as a matter of law. As discussed below, there is at least a genuine issue of material fact as to whether USS could have anticipated that a purchaser would use local clay to fill a culvert.
 
 
 41
 Searls and Williams are equally inapposite. In both cases, the defendant component part manufacturers played no part in designing the final assembled product. In fact, they did not even design the components they supplied, relying instead on specifications set by the final assembler. Under these circumstances, where an assembler had total control over the final product and far greater knowledge as to its dangerous propensities, the Ohio courts of appeals held that the component part manufacturers were under no duty to warn of speculative dangers, provided the parts were delivered in conformity with specifications. Here, by contrast, it was the component supplier, USS, that provided the specifications for both the culvert and the component arch. USS also drew up the instructions for assembling all components into the culvert. Having supplied numerous plate arches for use in culverts in the past, USS had far greater information regarding dangerous propensities in the completed structure than did Paulding County. In the case before us, the positions of the component maker and the assembler concerning control over and information about the final product are precisely the opposite of those encountered by the Ohio courts in the cases cited. We therefore cannot agree that the rule announced in Temple and Searls forecloses inquiry into whether USS' duty of ordinary care included warning Paulding County of the possibility of collapse if the bridge were not constructed in conformity with proper instructions. This conclusion is in accord with numerous cases from other jurisdictions in which component part manufacturers have been held to a standard of due care with regard to the provision of instructions and warnings. See, e.g., DeSantis v. Parker Feeders, Inc., 547 F.2d 357, 361 (7th Cir.1976) (where defendant component part maker knew of the dangers of incorporating the part in an incompatible system, the jury could reasonably find the component defective for failure to include a warning); Suchomajcz v. Hummel Chemical Co., 524 F.2d 19 (3rd Cir.1975) (component chemical manufacturer had a duty to warn purchaser of the explosive nature of the end product even when the particular chemical supplied was harmless); Beauchamp v. Russell, 547 F.Supp. 1191 (N.D.Ga.1982) (a manufacturer of a component part has a duty to warn of a danger that may result from a reasonably foreseeable use of its product). Having determined that the defendants were not legally immune from a duty to adequately instruct or warn, we must now determine whether there are facts on the record to support the argument that this duty was breached.
 
 2. Breach of the Duty to Instruct or Warn
 
 42
 In Hargis v. Doe, 3 Ohio App.3d 36, 443 N.E.2d 1008 (1981), the Ohio Court of Appeals described the duty to instruct in the following terms:
 
 
 43
 [A] supplier is subject to liability for the damages proximately caused by the use of his product, in the manner and for the purpose for which it was supplied, if he fails to exercise reasonable care to give the user information which he has and which he should realize would be necessary to make the use of the product safe.
 
 
 44
 Id. 443 N.E.2d at 1010 (citing RESTATEMENT (SECOND) OF TORTS Sec. 388). Depending upon the danger created by a particular product, simple instructions may be inadequate to convey the gravity of the risk, and a clear warning may be required. As the Ohio Supreme Court explained in Seley v. G.D. Searle & Co., 67 Ohio St.2d 192, 423 N.E.2d 831 (1981), at syllabus:[9]
 
 
 45
 The fact finder may find a warning to be unreasonable, hence inadequate, in its factual content, its expression of the facts, or the method or form in which it is conveyed. The adequacy of such warnings is measured not only by what is stated, but also by the manner in which it is stated. A reasonable warning not only conveys a fair indication of the nature of the dangers involved, but also warns with the degree of intensity demanded by the nature of the risk.
 
 
 46
 423 N.E.2d at 837 (citations omitted); see also White v. Dealers Transit, Inc., 4 Ohio App.3d 40, 446 N.E.2d 460, 466 (1980). The same considerations are included in the formulation of the duty to warn contained in the RESTATEMENT (SECOND) OF TORTS Sec. 388.[10]
 
 
 47
 A canvass of the record reveals that the appellants have brought forth facts sufficient to defeat summary judgment on their theory that USS breached its duty to exercise reasonable care in the marketing of the arch. As illustrated below, the appellants have adduced evidence to indicate that (1) USS engineers either knew or ought to have known of the risk that a culvert made from its 30-foot arch would collapse if improperly backfilled; (2) USS either knew or ought to have known that many purchasers of the arch were unaware of which materials were acceptable as backfill, of the proper procedure for compacting the material, or of the potential for harm attendant on improper backfilling; and (3) USS nevertheless failed to provide purchasers with either instructions which, if followed, would have prevented collapse, or with a clear warning of the dangers of not proceeding properly.
 
 
 48
 In order to establish the relevancy of these points, it is necessary to first briefly discuss the actual cause of the Zuber Creek bridge collapse.
 
 
 49
 (a) The Cause of the Collapse
 
 
 50
 Most simply stated, the culvert collapsed because of shifts in the backfill. Among the experts who have so far testified, there is a near consensus that the use of clay as backfill was the primary cause of the shifting. Apparently, when the clay became saturated, water would flow inside it, causing shifts and settlement. The soil movement, in turn, caused distortion in the flexible arch, leading to structural instability and eventual collapse. Some dispute remains as to whether, if the instructions on compaction and moisture testing of the backfill had been followed, collapse could have been avoided even with the use of clay. At least one expert has stated that collapse was the inevitable result of using clay, and that no amount of compaction could have avoided it. We now explore the argument that the defendants failed to exercise reasonable care to guard against this risk.
 
 
 51
 (b) Knowledge of the Danger in 1972
 
 
 52
 Because Ohio law treats the duty to instruct or warn under a negligence standard, the obligation extends only to those risks of which the defendant is aware or, in the exercise of reasonable care, ought to be aware. See Hargis v. Doe, 443 N.E.2d at 1010. The appellants have produced persuasive evidence that USS was aware of the danger attendant upon the use of clay in backfill at the time the bridge kit was sold. The product manager for USS multi-plate arches, James Lighthiser, testified that by 1972 he knew that clay "wasn't the material to use" because of its instability. He also testified that he was aware at that time that with significant movement of the backfill "you're going to have a collapse." Lighthiser's testimony is consistent with that of other experts who have stated that the dangers of clay were generally known by soil engineers at the time the bridge kit was sold.
 
 
 53
 There is also substantial evidence to suggest that USS was aware of the possibility that builders might use clay in backfills. In fact, Lighthiser testified that he knew that those installing the culverts might use clay. He also admitted knowing that at least some of the people installing the culverts were unfamiliar with proper backfilling procedures. It appears that the use of clay backfill in culverts with shorter spans was not uncommon and posed less danger than it did with the Zuber Creek structure. The appellants have introduced expert testimony stating that the 30-foot arch used to bridge Zuber Creek was "at the extreme state of the art" and, because of its long span, required special attention to proper backfilling. Several experts have testified that the length of the arch made it far more susceptible to collapse due to improper filling than the shorter culvert arches more commonly installed. Under these circumstances, a reasonable jury could well conclude that USS was or ought to have been aware that the use of clay backfill could cause collapse, and that it was foreseeable that purchasers would use clay in ignorance of the special danger it posed to the stability of the 30-foot culvert. The next step in the analysis is to inquire whether, assuming its knowledge of the risk of collapse, USS took reasonable measures to inform Paulding County of the danger.
 
 
 54
 (c) The Instructions
 
 
 55
 As noted above, the defendants did not provide on-site assistance to the crew erecting the bridge, and Paulding County did not seek any guidance from either USS or American Culvert. The sole information communicated by USS consisted of several pages of typed instructions placed in a keg of bolts delivered with the arch.
 
 
 56
 The instructions on backfilling begin with following language:
 
 C. BACKFILLING
 1. IMPORTANCE OF BACKFILLING
 
 57
 The strength of plate-arch structures is, to a large extent, dependent upon proper backfilling.
 
 
 58
 Corrugated sectional plate structures build up side support against the soil as they deflect under load. Therefore, to obtain maximum load bearing capacities and to prevent washing out and settlement, it is necessary that backfill be made of good material properly placed and carefully compacted.
 
 2. BACKFILL MATERIAL
 
 59
 Selected drainable backfill material is preferred, but most local fill material can be used provided it is carefully placed and compacted. It should be free from large rocks and hard lumps or clods larger than 3" in diameter. Do not use sod or earth containing a high percentage of organic material. Granular material containing a small amount of silt or clay is ideal since it makes dense stable fill.
 
 
 60
 The instructions then provide for proper compaction of the soil, specifying that "the material shall be delivered to the backfill surface at a uniform rate," and that the fill should be compacted in layers not to exceed eight inches in depth.
 
 
 61
 According to the instructions, the material used as backfill "shall contain the amount of moisture required for optimum compaction as nearly as can be practically determined," and the Standard Proctor Compaction Test "may be used as a guide in the control of the compaction of the fill material." Finally, USS suggests that the layers be compacted with a sheepsfoot roller or, alternatively, with a pneumatic tamper. The section on backfilling concludes with an invitation to "[c]onsult American Bridge Division for specific job recommendations."
 
 
 62
 (d) The Adequacy of the Instructions
 
 
 63
 In retrospect, the most conspicuous aspect of the instructions is their failure to indicate that clay should not be used in backfill. The nearest approach to such a statement is the suggestion that "[g]ranular material containing a small amount of silt or clay is ideal since it makes dense stable fill." Considering the deposition testimony to the effect that clay created an excessive danger of collapse regardless of compaction, and that USS was aware of the danger, a reasonable jury could certainly conclude that USS' failure to specify that clay should not be used breached the duty to instruct.
 
 
 64
 In addition, there is a substantial issue as to whether USS breached its duty to adequately warn of the known danger of using clay or failing to follow proper compaction procedures. The only cautionary language contained in the instructions states that "[t]he strength of the plate arch is, to a large extent, dependent upon proper backfilling." That rather mild admonition is not followed by a warning of the dire consequences of improper backfilling. In fact, the implication of the next paragraph is that improper backfilling will simply reduce the "maximum load bearing capacit[y]" of the structure and result in "washing out and settlement." This statement is hardly consistent with a clear warning that inadequate filling may cause the entire structure to collapse. A reasonable jury could well conclude that, even if following the instructions on compacting would have prevented the collapse, USS nevertheless breached a duty by failing to warn of the consequences of not following those instructions.[11]
 
 
 65
 (e) The Wells Warning
 
 
 66
 The defendants contend that even if they did fail to satisfy a duty to warn through the instructions they provided with the bridge kit, the duty was ultimately fulfilled by Wells' communications with Stouffer. In fact, the defendants maintain that this result is mandated by that portion of our 1988 decision in which we affirmed summary judgment against the plaintiffs on their negligent instruction claims.
 
 
 67
 In our earlier decision, we reviewed Wells' actions in August of 1976 to determine whether they constituted a negligent inspection according to the RESTATEMENT (SECOND) OF TORTS Sec. 324A. Crediting Wells' deposition testimony, we found that he
 
 
 68
 told Stouffer of the possible consequences if the bridge continued to move, describing what is known in the industry as the "tin can" effect (the steel plates buckle until they reach the snapping point). Wells further testified that he even drew a sketch of the arch to graphically show Stouffer at what point the deformation should cause concern and when it would be dangerous and approaching collapse. To determine whether the structure was continuing to move, he recommended periodic measurements of the arch be taken in the areas of the flattening plates, the span, the peak, and the base. Finally, Wells advised Stouffer that, if the bridge continued to move, the backfill would have to be removed, the arch restored to its original shape, and new backfill placed and compacted.
 
 
 69
 Miles v. Paulding County Rd. Comm'rs, slip op. at 23.
 
 
 70
 We then found that by undertaking his inspection Wells "did incur a limited duty to ascertain the general nature of the problem and notify the County of his findings," but that the "duty was clearly satisfied." Id. at 24.
 
 
 71
 Wells' satisfaction of the "limited duty" to inspect adequately by no means compels the decision that his actions discharged the defendants' initial duty to exercise reasonable care in warning Paulding County of known dangers before the culvert was constructed. As noted above, the adequacy of a warning must be judged with regard to all attendant circumstances. Here, we find the fact that the warning came approximately four years after Paulding County purchased and erected the bridge kit to be of paramount importance. Viewing the facts in the light most favorable to the appellants, we cannot say as a matter of law that Wells' belated warning, however forceful, constitutes an exercise of due care under the circumstances.
 
 3. Proximate Cause
 
 72
 The defendants next argue that even if they did breach a duty to instruct or to warn, the plaintiffs may not recover damages because no causal link has been established between the breach and the collapse of the bridge. The defendants make two separate arguments: (1) that any breach of the duty to provide accurate instructions could not have "caused" the ultimate collapse of the culvert because Paulding County never read the instructions that were provided, and (2) that Paulding County's failure to respond adequately to Wells' 1976 warning was a superseding cause of the collapse.
 
 
 73
 As a preliminary matter, we note that defendants' burden on this issue is particularly heavy at the summary judgment stage, for under Ohio law proximate cause is a factual question to be decided by the jury in all but the most extreme cases. Rimer v. Rockwell Int'l Corp., 739 F.2d 1125, 1130 (6th Cir.1984); Drayton v. Jiffee Chem. Corp., 591 F.2d 352, 360 (6th Cir.1978).
 
 
 74
 In Seley, the Ohio Supreme Court discussed the issue of proximate cause with regard to warnings:
 
 
 75
 Where no warning is given, or where an inadequate warning is given, a rebuttable presumption arises, beneficial to the plaintiff, that the failure to adequately warn was a proximate cause of the plaintiff's [injury]. This presumption, absent the production of rebutting evidence by the defendant, is sufficient to satisfy the first branch of the plaintiff's proximate cause burden.
 
 
 76
 423 N.E.2d at 838, quoted in Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784, 791 (6th Cir.1984). In order to obtain summary judgment at this stage, therefore, the defendants must prove that even if warnings of collapse had been included in the instructions, they would have been disregarded. A review of the record reveals that this burden has not been met.
 
 
 77
 In our initial opinion, we wrote "it appears that some attempt was made to follow the USS instructions" on backfilling the bridge. Miles v. Paulding County Rd. Comm'rs, slip op. at 6. This observation finds support in Dunakin's deposition testimony:
 
 
 78
 Q. Now, were you doing something contrary to their instructions on the type of soil to use in the backfill or did you comply within the instructions that they provided for you for the Zuber Creek culvert?
 
 
 79
 ....
 
 
 80
 A. Well, I feel that we abided by the general instructions.
 
 
 81
 ....
 
 
 82
 Q. From what I take it the instructions and the materials that were sent to you by U.S. Steel, you followed the instructions as they gave them to you?
 
 
 83
 A. As near as possible.
 
 
 84
 ....
 
 
 85
 Q. Now, let me ask you: Do you recall what use you made of the instructions you received from U.S. Steel for erection of this culvert?
 
 
 86
 A. Well, I had a superintendent, he had that with him. They tried to abide by it. That's all I can tell you.
 
 
 87
 Dunakin has also given testimony tending to show that he did not follow USS backfilling instructions:
 
 
 88
 Q. Now, these instructions also cover backfilling. Did you ever pay any attention to the instructions on backfilling, Mr. Dunakin, or did you usually follow your own experience?
 
 
 89
 A. I would say we used our own experience and observing other people, what other people did. That was one method of doing things.
 
 
 90
 After we remanded the case, attorneys for USS obtained an affidavit from Dunakin reading, in pertinent part, as follows:
 
 
 91
 2. I do not know now whether anyone from the County read the instructions on backfilling that came with the arch we installed over Zuber Creek in 1973.
 
 
 92
 3. As far as I am aware, the only thing that the Paulding County work force relied upon in doing the backfill work on the Zuber Creek bridge in 1973 was our own collective experience....
 
 
 93
 The defendants appear to concede that Dunakin's deposition testimony alone raises a genuine issue of fact as to whether or not the county relied on the backfill instructions. They maintain, however, that the issue was definitively resolved in their favor by the affidavit. This argument is flawed in two respects. First, the affidavit is of far less probative value than the deposition testimony. It states Dunakin's recollection five years after the deposition, and that recollection was not tempered by the cross examination of appellants' attorneys. Second, the affidavit simply does not answer the question at issue: whether those who directed the backfilling read the instructions USS provided. To that question, Dunakin responds with the words, "I do not now know."
 
 
 94
 As the supervisor who directed the backfilling is now deceased, any additional evidence as to whether Paulding County relied on the instructions must be circumstantial. The appellants have presented such evidence in the fact that the actions of the county work crew were, at least to some extent, consistent with the instructions.[12] In addition, two construction workers testified that they saw the site supervisor consult what appeared to be the USS instructions. When all the evidence is viewed together, a genuine factual dispute remains as to whether Paulding County employees read the instructions on backfilling the culvert.
 
 
 95
 Even if there were no evidence supporting reliance, however, this fact would not be fatal to the plaintiffs' failure to warn claims. As noted above, the adequacy of a warning depends not only on its substance, but also on the form in which it is presented. See Seley, 423 N.E.2d at 837. An adequate warning cautions "with the degree of intensity demanded by the nature of the risk." Id. at 837. A jury could reasonably have concluded that, even if Paulding County did disregard the instructions, an adequate warning would have been presented in such a way that it could not have been ignored. The defendants have failed to rebut the Seley presumption that Paulding County would have heeded such a clear cautionary statement.[13]
 
 
 96
 In their second proximate cause argument, the defendants maintain that by failing to act upon Wells' warning, Paulding County broke the chain of causation between the original breach of the duty to warn and the collapse of the bridge.
 
 
 97
 Despite several recent decisions in the area, see R.H. Macy & Co. v. Otis Elevator Co., 51 Ohio St.3d 108, 554 N.E.2d 1313 (1990); Mussivand v. David, 45 Ohio St.3d 314, 544 N.E.2d 265 (1989); Merchants Mutual Ins. Co. v. Baker, 15 Ohio St.3d 316, 473 N.E.2d 827 (1984); Cascone v. Herb Kay Co., 6 Ohio St.3d 155, 451 N.E.2d 815 (1983), Ohio law remains somewhat unclear on the rule for determining whether an intervening act or omission will relieve a negligent party of liability for damages actually caused by its negligence. Mussivand, the most recent statement of the general rule of superseding cause in tort claims, appears to emphasize the central place of foreseeability in the analysis:
 
 
 98
 [D]etermining whether an intervening cause "breaks the causal connection between negligence and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the negligence. If an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence...."
 
 
 99
 544 N.E.2d at 272. In addition to foreseeability, however, the Ohio courts have generally taken cognizance of "whether [the] intervening actor was a conscious and responsible agency which could or should have eliminated the hazard." Cascone, 451 N.E.2d at 819 (footnote omitted). Where any doubt remains as to either of these factors, the issue of proximate cause will present " 'questions for submission to a jury which generally may not be resolved by summary judgment.' " Merchants Mutual, 473 N.E.2d at 829 (quoting Cascone, 451 N.E.2d at 816) (citations omitted).
 
 
 100
 In response to controversy over whether the defense of superseding cause should be available in products liability actions based on strict liability, the Ohio Supreme Court decided the issue in Macy. The Macy court held that such a defense is available, and then approved the use of 1 Ohio Jury Instructions Sec. 11.30 (1983) to explain the concept. The instruction provides, in relevant part:
 
 
 101
 3. SUPERSEDING CAUSE. Causal connection is broken when a subsequent act, or failure to act, intervenes and completely removes the effect of the first act of negligence and is itself the proximate cause of the (injury) (damage). The causal connection of the first act of negligence is broken and superseded by the second, only if the intervening negligent act is both new and independent. The term "independent" means the absence of any connection or relationship of cause and effect between the original and subsequent act of negligence. The term "new" means that the second act of negligence could not reasonably have been foreseen.
 
 
 102
 554 N.E.2d at 1317. Although the claims remaining in the action before us are grounded in negligence rather that strict liability, the Macy court expressed its approval of the instruction on grounds independent of the basis of liability. It appears, therefore, that the instruction provides the most authoritative statement of the rule for superseding cause in products liability actions regardless of the theory of recovery.
 
 
 103
 Assessing the defendants' superseding cause arguments according to this standard, we cannot agree that the facts are sufficiently clear to warrant summary judgment. In particular, we do not agree that Paulding County's failure to remedy the dangerous condition of the Zuber Creek culvert was so unforeseeable as to justify the unusual measure of removing the question of proximate cause from consideration by the jury. See Cascone, 451 N.E.2d at 820 (negligent action by a third person was not, as a matter of law, unforeseeable; therefore, a jury question was presented on the issue of superseding cause). We therefore decline defendants' invitation to affirm summary judgment at the proximate cause stage.[14]
 
 
 104
 The appellants have raised genuine issues of material fact with regard to each element of their negligence claims. Accordingly, summary judgment on all inadequate instruction and negligent failure to warn claims must be reversed.
 
 4. Negligent Design Claims
 
 105
 Paulding County maintains that a separate cause of action remains for the negligent design of the bridge kit. The Ohio Supreme Court stated the rule for negligent design claims in Temple v. Wean, 364 N.E.2d at 273: " '[It] is the duty of a manufacturer to use reasonable care under the circumstances to so design his product as to make it not accident or foolproof, but safe for the use for which it is intended.' " (Quoting Gossett v. Chrysler Corp., 359 F.2d 84, 87 (6th Cir.1966)).
 
 
 106
 We agree with the district court that the only evidence of a breach of reasonable care in this case concerns the adequacy of the instructions and the warning accompanying the bridge kit. For the reasons outlined in Part B of our earlier opinion, in which we affirmed summary judgment as to all strict products liability claims because of the appellants' failure to demonstrate the presence of a defect, we reject appellants' argument that the physical components of the bridge kit made it unsafe for the use for which it was intended. See Miles, slip op. at 18-21. Accordingly, the claim for negligent design was properly dismissed at the summary judgment stage.
 
 5. Punitive Damages
 
 107
 Our reversal of summary judgment on the negligent instruction and failure to warn claims against USS will allow appellants to proceed with an action for compensatory damages. A review of the record, however, reveals that plaintiffs' claims for punitive damages are without sufficient factual foundation and should be disposed of at the summary judgment stage.
 
 
 108
 The law of Ohio allows recovery of punitive damages in tort actions only when fraud, malice, or insult has been proved. Preston v. Murty, 32 Ohio St.3d 334, 512 N.E.2d 1174, 1175 (1987). As the plaintiffs have alleged neither fraud nor insult, malice must form the basis of their claim. The Supreme Court of Ohio has stated that two categories of conduct will satisfy the malice requirement: "first, behavior characterized by hatred, ill will, or a spirit of revenge and, second, extremely reckless behavior revealing a conscious disregard for a great and obvious harm." Id. 512 N.E.2d at 1175. As the record will not support a claim that USS proceeded with hatred, ill will, or revenge, the plaintiffs must show recklessness and conscious disregard for the rights and safety of others. Punitive damages on this basis will be awarded only where two general conditions have been satisfied. The first is that the party must have acted in a "deliberate or intentional" manner. Id. 512 N.E.2d at 1176. "It requires the party to possess knowledge of the harm that might be caused by his behavior." Id. The second is that "something more than mere negligence is always required." Id. As the Preston court explained:
 
 
 109
 The concept requires a finding that the probability of harm occurring is great and that the harm will be substantial. A possibility or even probability is not enough as that requirement would place the act in the realm of negligence.
 
 
 110
 512 N.E.2d at 1176 (citations omitted).
 
 
 111
 Finally, the court cautioned that, where "conscious disregard" forms the basis of a claim,
 
 
 112
 before submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety.
 
 
 113
 512 N.E.2d at 1176.
 
 
 114
 In the instant case, the appellants have failed to adduce any evidence that USS was aware that its actions with regard to the construction or marketing of the bridge kit created such a great probability of substantial harm as to remove its actions from the realm of mere negligence. The appellants have also failed to bring forth any evidence that USS disregarded the safety of others in a "conscious, deliberate or intentional" manner. While there is evidence that USS employees knew that the use of clay backfill might lead to collapse, appellants have acknowledged that the engineer who actually wrote the backfill instructions was unaware of the peril. Others at USS may have recognized the danger; however, the appellants have failed to provide evidence that any USS employee made a conscious, deliberate, or intentional decision to market the bridge kit with knowledge of the great probability that a culvert built around the structure would collapse. Accordingly, all claims for punitive damages based on USS' alleged failure to adequately instruct on backfilling procedures and its alleged failure to warn Paulding County of the dangers of improper backfilling should be dismissed on remand.
 
 
 115
 C. Negligence Claims Against American Culvert
 
 
 116
 Having determined that the district court erred in granting summary judgment to USS on a component part manufacturer theory and that factual issues remain to be resolved in the negligence claims pending against USS, we now turn to appellants' negligence claims against American Culvert and Ohio Bridge.
 
 
 117
 From the record, it is apparent that American Culvert's sole involvement in this case is as a retailer of the bridge kit designed, manufactured, and marketed by USS. American Culvert's actions were limited to bidding for a contract to deliver the kit to Paulding County, purchasing the kit from USS, and delivering the kit to the Zuber Creek site. The appellants have presented no facts to indicate that American Culvert failed to exercise ordinary care in the performance of these actions.
 
 
 118
 Evidently, appellants would have us hold American Culvert liable for negligent failure to warn of the dangerous characteristics of the bridge kit. As stated above, however, the duty to warn extends only to those risks of which a defendant was aware or, in the exercise of reasonable care, ought to have been aware. Appellants have produced no evidence whatsoever that American Culvert either was or ought to have been aware of the allegedly dangerous nature of the bridge kit at any time before delivery. Any claims against American Culvert therefore can be maintained only on a strict liability theory of recovery against the vendor of a defective product. We proceed now to consideration of the claims against Ohio Bridge.
 
 D. Claims Against Ohio Bridge
 
 119
 Only two of the plaintiffs, the Underwoods, have questioned the propriety of granting summary judgment in favor of defendant Ohio Bridge. The gravamen of their claim in this regard is that Ohio Bridge and American Culvert are in fact one enterprise, and that the jury should be allowed to disregard American Culvert's corporate form and enter judgment against Ohio Bridge for actions nominally performed by its "alter ego." A brief history of the two businesses fills out the arguments on both sides.
 
 
 120
 Herman and Ted Rogovin entered the bridge-building business in 1936. As their enterprise grew and diversified, they formed American Culvert Corporation in 1946 and Ohio Bridge Corporation six years later. The two corporations have, at all relevant times, been owned by the Rogovin family. American Culvert fabricates and sells culvert pipe and also acts as a local distributor for the sale of corrugated steel arches such as the one giving rise to this litigation. Ohio Bridge, on the other hand, fabricates and installs welded steel beam bridges and steel truss bridges. From the record, it appears that Ohio Bridge is a viable going concern. It will be recalled that American Culvert filed for protection under the bankruptcy laws after the initiation of this action.
 
 
 121
 Ohio Bridge was originally joined as a defendant because Paulding County's Board of Commissioners had erroneously designated it, rather than American Culvert, as the successful bidder on the arch. The plaintiffs argued vigorously below that Ohio Bridge was in fact "involved in [some] stage of the transaction." They also argued that, even if no such involvement could be shown, the two corporations were both under the total control of the Rogovins, and therefore that it was appropriate to disregard the corporate form when assessing liability.
 
 
 122
 The district court granted summary judgment for Ohio Bridge on the grounds that:
 
 
 123
 There is ... no evidence before the Court which connects Ohio Bridge with the execution of the contract of sale of the arch.... There is no evidence that the County and Ohio Bridge entered into an actual contract for the multi-plate arch in question. In contrast, a number of records before the Court show that the contract in question was executed by American Culvert.
 
 
 124
 Miles v. Kohli & Kaliher, No. C 83-325, slip op. at 3 (N.D.Ohio Mar. 27, 1989). The court also declined to "pierce the corporate veil," finding "no evidence, or even the suggestion that the Rogovins have undercapitalized or 'milked' either corporation." The Underwoods claim that there are facts sufficient to allow a jury to decide whether Ohio Bridge's legal status as a separate corporate entity should be disregarded. We disagree.
 
 
 125
 Under Ohio law, a corporation is presumed to be an autonomous entity, wholly separate from its shareholders. See Bucyrus Erie Co. v. General Prods., 643 F.2d 413, 418 (6th Cir.1981) (Ohio law). In Bucyrus Erie, we explained that, under the law of Ohio, the fiction of corporate personality will be disregarded only when three conditions are satisfied:
 
 
 126
 (1) domination and control over the corporation by those to be held liable is so complete that the corporation has no separate mind, will, or existence of its own; (2) that domination and control was used to commit fraud or wrong or other dishonest or unjust act; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.
 
 
 127
 643 F.2d at 418.[15] Since this court's decision in Bucyrus Erie, the Ohio Supreme Court has indicated its concern with substantially the same factors. See E.S. Preston Assoc., Inc. v. Preston, 24 Ohio St.3d 7, 11, 492 N.E.2d 441, 446 (1986).
 
 
 128
 The Underwoods have adduced considerable evidence that Ohio Bridge is separate from American Culvert in name only. For example, it appears that, at all relevant times, the officers and directors of the two corporations have been the same members of the Rogovin family. The shareholders of both entities are substantially the same. The two corporations have shared the same business office, mailing address, and telephone number. It appears that salespeople work for both companies and do not account separately for the amount of time they spend with one or the other. There is also evidence that the two corporations are in fact separate enterprises;[16] however, we agree with the Underwoods that a genuine issue of fact exists as to whether the first element of the Bucyrus Erie test has been met. Dispute on this issue alone, however, is insufficient to bring the plaintiffs' claims before the jury in the absence of any evidence that the corporate form was used "to commit fraud or wrong or other dishonest or unjust act[s]." Bucyrus Erie, 643 F.2d at 418. All the Underwoods have presented to this court as evidence of such fraud is the fact that American Culvert filed for bankruptcy, together with the conclusory statement that "a voluntary bankruptcy, at a minimum, 'suggests' a plan to protect the entire Rogovin bridge enterprise by sacrificing American Culvert." Under the law of Ohio, the plaintiff bears the burden of proving the necessity of piercing the corporate veil. E.S. Preston Assoc., Inc., 492 N.E.2d at 446. A party bearing the burden of proof on an issue will withstand summary judgment only by providing "concrete evidence supporting its claims." Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir.1989). The solitary fact that American Culvert has filed for bankruptcy is simply insufficient to satisfy the required showing of fraud, dishonesty, or wrongdoing. We need not, therefore, consider the third element of the Bucyrus Erie test to find that summary judgment was properly granted in favor of Ohio Bridge.
 
 
 129
 Having addressed all claims grounded in negligence, we now proceed to review the warranty claims.
 
 E. Warranty Claims
 
 130
 Upon remand, Paulding County asserted claims for breach of express warranty based on tort and contract theories of recovery. The county claimed that USS and American Culvert made affirmations regarding the quality of USS bridge kits, and the culverts made from them, in advertising brochures produced by USS and delivered to Dunakin by an American Culvert salesperson. The district court granted summary judgment on both claims. With regard to the tort action, the court determined that there was "virtually no evidence" to indicate that Dunakin had relied on any representations made in the catalogs when he decided to purchase the arch. The court then disposed of the contract claim by finding that it had not been brought within the time prescribed by the applicable statute of limitations. As explained below, we are in full accord with the court's analysis.
 
 1. Tortious Breach of Warranty
 
 131
 In order to establish a claim for tortious breach of warranty under Ohio law, a buyer must show "an affirmation of fact by the seller as to a product or commodity to induce the purchase thereof, on which affirmation the buyer relies in making the purchase." Rogers v. Toni Home Permanent Co., 167 Ohio St. 244, 147 N.E.2d 612, at syllabus (1958); accord Inglis v. American Motors Corp., 3 Ohio St.2d 132, 209 N.E.2d 583 (1965). The defendants do not deny that affirmations of quality were made in the brochures describing USS bridge kits. They argue only that there are no facts in the record to indicate that Dunakin had read these representations at any time before he selected the bridge kit. We agree.
 
 
 132
 The sole evidence that Paulding County has adduced on the issue of reliance is Dunakin's testimony that "John Sanders of American Culvert gave him some literature and it is undisputed that the catalogs were subsequently found in the Paulding County's files." In fact, however, when he was shown the catalog in question and asked whether he had read it before deciding to purchase the arch, Dunakin replied: "I don't think I had that book at the time. I think I had one later. At that time, I just had a sheet on it, on the structures."
 
 
 133
 The "sheet" referred to apparently displayed a chart showing the different spans, rises, and gauges of metal arches offered by USS. There is no evidence that the "sheet" contained any of the affirmations of quality or integrity required to maintain an express warranty claim. Paulding County has failed to bring to light any facts supporting its tortious breach of warranty claim, and summary judgment was therefore appropriate.
 
 2. Breach of Express Warranty in Contract
 
 134
 Claims for breach of express warranty in contract are governed by Ohio's adoption of the Uniform Commercial Code, Ohio Rev.Code Sec. 1302.26.[17] The statute of limitations for such claims is set out in Ohio Rev.Code Sec. 1302.98(B), which provides as follows:
 
 
 135
 (B) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.
 
 
 136
 Paulding County claims that a statement in a USS brochure reading "Sectional Plate structures should, under normal conditions, last indefinitely with little or no maintenance" constitutes an express warranty extending to the future performance of the arch.
 
 
 137
 Assuming, arguendo, that this statement could qualify as an express warranty under Ohio Rev.Code Sec. 1302.26,[18] we agree with the district court that Paulding County should have discovered a breach of that warranty no later than August 3, 1976, when Wells visited the bridge site and, in the words of our earlier decision, "correctly identified the nature of the problem and communicated his findings to the appropriate County authority." Miles, slip op. at 25. Wells' statement indicated that, at the very least, extensive maintenance would be required on the culvert, and thus should have alerted Paulding County to a breach of the alleged warranty.
 
 
 138
 The decision of the district court is AFFIRMED in part and REVERSED in part, and the case is REMANDED for reconsideration in accordance with this opinion.
 
 
 
 *
 Honorable Horace W. Gilmore, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 See Miles v. Paulding County Road Commissioners, No. 86-3614, slip op. at 7 (6th Cir. Jan. 26, 1988) [837 F.2d 476 (table) ]
 
 
 [2]
 An analysis of the bridge's surface following its collapse revealed that additional applications of asphalt had been required to patch the road surface on numerous occasions between 1977 and 1982
 
 
 [3]
 USS has now dismissed without prejudice its claims against American Culvert
 
 
 [4]
 The order granting Ohio Bridge's motion for summary judgment applied to only one of the several defendants in the case. Under Fed.R.Civ.P. 54(b):
 [W]hen multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an expressed determination that there is no just reason for delay and upon an express direction for the entry of judgment.
 The December 11, 1984, order did not direct the entry of a final judgment. The order was therefore not appealable pending resolution of the litigation as to all remaining parties. This resolution ultimately occurred on May 31, 1989.
 
 
 [5]
 See Miles v. Paulding County Rd. Comm'rs, slip op. at 3
 
 
 [6]
 Our decision contained three separate holdings. First, we reversed the district court's ruling that all claims against USS and American Culvert were barred by the Ohio Statute of Repose for Architects and Engineers, Ohio Rev.Code Ann. Sec. 2305.131 (1981). We found that the statute was not intended to extend protection to "materialmen" such as the defendants. In so doing, we drew a distinction between those who design specific improvements to real property, who merit protection under the statute, and those who design a standardized product incorporated into such an improvement, who do not. Second, we upheld the grant of summary judgment as to all products liability claims. See discussion infra. And third, we affirmed summary judgment on the plaintiffs' claims that Wells had performed his inspection negligently. See RESTATEMENT (SECOND) OF TORTS Sec. 324A. All negligence and warranty claims were remanded for further consideration
 
 
 [7]
 The doctrine is not an "inexorable command," Piambino v. Bailey, 757 F.2d 1112, 1120 (11th Cir.1985) (quoting White v. Murtha, 377 F.2d 428, 431 (5th Cir.1967)), and will not preclude reconsideration of issues when substantially new evidence has been introduced, when there has been an intervening change of law, or when the first decision was clearly erroneous and enforcement of its command would work substantial injustice. Coal Resources, Inc. v. Gulf & Western Indus., 865 F.2d 761, 767 (6th Cir.1989) (quoting Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 657 (Fed.Cir.), cert. denied, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985)). None of these exceptions applies here
 
 
 [8]
 In support of the proposition that claims of inadequate warning and failure to properly instruct "do not give rise to a strict liability cause of action," Miles, slip op. 21, we relied on two Sixth Circuit decisions: Rimer v. Rockwell Int'l Corp., 739 F.2d 1125 (6th Cir.1984), and Overbee v. Van Waters & Rogers, 706 F.2d 768 (6th Cir.1983) ("no strict liability cause of action arising from allegations of inadequate warning could be maintained under Ohio law." 706 F.2d at 770). These cases, in turn, found support in two decisions of the Ohio Supreme Court: Temple v. Wean United, Inc., 50 Ohio St.2d 317, 364 N.E.2d 267 (1977), and Knitz v. Minister Machine Co., 69 Ohio St.2d 460, 432 N.E.2d 814 (1982). In Temple, the court wrote:
 It is ... apparent that the rule imposing an obligation on the manufacturer or seller to give suitable warning of a dangerous propensity of a product is a rule fixing a standard of care, and any tort resulting from the failure to meet this duty is, in essence, a negligent act.
 
 
 [50]
 Ohio St.2d at 325, 364 N.E.2d 267. While we held in Rimer and Overbee that this statement disposed of all strict liability claims alleging a failure to warn, in Crislip v. TCH Liquidating Co., 52 Ohio St.3d 251, 556 N.E.2d 1177 (1990), the Ohio Supreme Court explained that the passage "did not mean that negligence is the exclusive cause of action for failure to warn, but rather that a negligence action is an alternative to a strict liability cause of action for failure to warn." 52 Ohio St.3d at 256, 556 N.E.2d 1177. Accordingly, the court decided that "[p]laintiffs may plead both negligence and strict liability for failure to warn." Id
 
 
 [9]
 The Seley court was concerned with the extent of the duty to warn attaching to those who market unavoidably dangerous products. See RESTATEMENT (SECOND) OF TORTS Sec. 402A, comment k. While we have held that the Ohio Supreme Court does not recognize a strict liability claim for failure to warn outside the context of unreasonably dangerous drugs, see Rimer v. Rockwell Int'l Corp., 739 F.2d 1125, 1128-29 (6th Cir.1984) (citing Knitz v. Minster Mach. Co., 69 Ohio St.2d 460, 432 N.E.2d 814 (1982)); but see Crislip v. TCH Liquidating Co., 52 Ohio St.3d 251, 255, 556 N.E.2d 1177 (1990), we have nevertheless found the Seley court's description of the extent of the duty to warn instructive in the context of negligent failure to warn cases. See Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784, 791 (6th Cir.1984)
 
 
 [10]
 RESTATEMENT (SECOND) OF TORTS Sec. 388 provides as follows:
 One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
 (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
 (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
 (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
 The Ohio courts have cited this section with approval. See Hargis v. Doe, 3 Ohio App.3d 36, 443 N.E.2d 1008, 1010 (1981).
 
 
 [11]
 It is well established that even instructions that indicate the correct procedures do not satisfy the duty to warn if they fail to indicate hidden consequences of not following the instructions. For example, an airplane manufacturer's instructions to a pilot to turn off the power boost in icing conditions was held insufficient to warn of the risk of power loss if the boost were left on. Kerns v. Engelke, 54 Ill.App.3d 323, 332, 12 Ill.Dec. 270, 277, 369 N.E.2d 1284, 1291 (1977); see also Tayam v. Executive Aero, Inc., 283 Minn. 48, 52, 166 N.W.2d 584, 588 (1969)
 
 
 [12]
 Apparently, the county attempted to use a "sheepsfoot roller" for compaction as USS had suggested in its instructions, but was unable to maneuver the roller in the confined space of the site. The county also acted consistently with the instruction in layering backfill of not more than eight inches alternately on each side and over the top of the arch, and compacting each layer individually
 The plaintiffs have conceded that Paulding County did not follow the backfill instructions in several respects, and we agree that the circumstantial evidence is not dispositive. It is, nevertheless, sufficient to withstand summary judgment.
 
 
 [13]
 In fact, the plaintiffs have presented compelling evidence that adequate warning and instruction in this case would require on-site supervision. The 30-foot arch was the largest ever marketed by USS for use in culverts. Several experts have testified that, because of its size and its flexibility, the arch was at the "leading edge" of technology. Another expert stated that such specialized knowledge was necessary to construct a culvert around an arch of this size, that it exhibited a "total lack of responsibility" for USS not to send expert assistance to direct installation. Yet another specialist characterized this failure as "grossly deficient."
 
 
 [14]
 This discussion does not, of course, foreclose USS from asserting that Paulding County's failure to respond to Wells' warning should be factored into a calculation of comparative negligence
 
 
 [15]
 The test was borrowed from Brunswick Corp. v. Waxman, 459 F.Supp. 1222, 1229 (E.D.N.Y.1978), aff'd, 599 F.2d 34 (2d Cir.1979). Formulations from other jurisdictions are substantially in accord. See, e.g., Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc., 872 F.2d 702, 704 (6th Cir.1988) (Michigan law); Van Dorn Co. v. Future Chem. and Oil Corp., 753 F.2d 565, 569-70 (7th Cir.1985)
 
 
 [16]
 The Underwoods acknowledge that each corporation has a separate bank account, files separate tax returns, has a different fiscal year, has separate manufacturing facilities, separate files, and separate hourly and clerical employees
 
 
 [17]
 Ohio Rev.Code Sec. 1302.26 provides, in pertinent part, as follows:
 (A) Express warranties by the seller are created as follows:
 (1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise....
 
 
 [18]
 It appears that it could not. In the absence of any evidence of reliance, a representation cannot be held to have constituted a basis of the bargain as required by the statute. See Price Bros. Co. v. Philadelphia Gear Corp., 649 F.2d 416, 422 (6th Cir.1981) (Ohio law)