RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

THE BABCOCK & WILCOX COMPANY,

*Plaintiff-Appellant*,

*v.*

No. 16-3305

CORMETECH, INC.,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:14-cv-00514—Kathleen B. Burke, Magistrate Judge.

Argued: December 8, 2016

Decided and Filed: February 15, 2017

Before: McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Ronald S. Kopp, ROETZEL & ANDRESS, LPA, Akron, Ohio, for Appellants. Bradley J. Barmen, LEWIS BRISBOIS BISGAARD & SMITH, LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Ronald S. Kopp, Jessica A. Lopez, ROETZEL & ANDRESS, LPA, Akron, Ohio, for Appellants. Brendan M. Richard, LEWIS BRISBOIS BISGAARD & SMITH, LLP, Cleveland, Ohio, for Appellee.

McKEAGUE, J., delivered the opinion in which KETHLEDGE, J., joined in part and in the result, and GRIFFIN, J., joined in part. KETHLEDGE, J. (pp. 15–16), delivered a separate opinion concurring in part and in the judgment. GRIFFIN, J. (pp. 17–19), delivered a separate opinion concurring in part and dissenting in part.

—————————

**OPINION**

—————————

McKEAGUE, Circuit Judge.    After completion of discovery and dispositive motion briefing, the district court issued an opinion explaining why defendant was entitled to summary judgment on both of plaintiff's contract claims.  As to the first claim, for breach of performance warranty in relation to the sale of a power plant emissions-control catalyst, the court sustained defendant seller's statute of limitations defense, holding that plaintiff filed its claim at least ten months after the limitations period had expired.  As to the second claim, for enforcement of contractual indemnity, the court held there was insufficient evidence to support a reasonable jury finding that plaintiff's losses resulted from a "defect" in the catalyst or "omission" in defendant seller's performance.  On appeal, plaintiff contends the court erred by failing to view the record in the light most favorable to the nonmovant.  We agree.  For the reasons explained below, we vacate the district court's ruling and remand for further proceedings.

## I. BACKGROUND

Plaintiff Babcock & Wilcox Company ("B&W") is a Delaware corporation having its principal place of business in Ohio.  B&W is in the business of designing, manufacturing, and constructing power generation facilities and emissions control equipment and services for power companies such as Kansas City Power & Light Company ("KCP&L").  In December 2005, B&W entered into a contract to design and construct a Selective Catalyst Reduction ("SCR") system to control emissions at one of KCP&L's coal-burning power stations in La Cygne, Kansas.  B&W issued a purchase order to defendant Cormetech, Inc. to obtain catalyst modules to be used in the SCR.  Cormetech is a Delaware corporation with its principal place of business in North Carolina.  Cormetech guaranteed that the catalyst it supplied would perform under the specified conditions for 24,000 operating hours before needing replacement.

KCP&L began operating the SCR at the La Cygne plant in April 2007.  In June 2007, B&W conducted an initial performance test, after approximately 1200–1500 hours of operation.  The results revealed that the rate of "ammonia slip" was higher than expected, meaning that

more ammonia was being emitted from the SCR than expected, albeit still within the guaranteed limits. This finding indicated that the catalyst could be subject to accelerated deactivation. B&W advised Cormetech by letter dated August 21, 2007, just four months after commencement of operation, that initial performance test results gave "reason to believe that the catalyst will not reach the end of life guarantees." R. 114-13, Rohner Letter 8/21/07, Page ID 4864. B&W invited Cormetech to cooperate with B&W "to determine the reasons for this advanced deactivation." *Id.* Cormetech responded immediately, observed that higher levels of "ammonia slip" were "measured (and corrected)," and confirmed that its investigation of the possible cause was continuing. R. 114-8, Schirmer Letter 8/31/07, Page ID 4821.

Cormetech continued testing the catalyst and next communicated its preliminary findings to B&W in October 2007, after 3000 hours of operation. Cormetech's report indicated that the catalyst was continuing to operate "above the performance threshold, but below the design deactivation curve." R. 114-9, Cormetech Letter 10/8/07, Page ID 4825–27. The measured loss of catalytic potential reportedly correlated with elevated concentrations of calcium oxide and phosphorous pentoxide found on the surface of some catalyst elements. The letter recommended continued monitoring and testing of catalyst performance and requested additional operational data for analysis.

Cormetech continued to conduct interim testing, as documented in Cormetech's performance test report, showing the collection of catalyst element samples in September 2007, November 2007, and May 2008, as well as inspection of the SCR reactor in April 2008. In December 2007, Cormetech informed B&W that its November 2007 lab test results were inconclusive: elevated levels of calcium and phosphorous were still evident, but "the rate of accumulation appear[ed] to have slowed." R. 114-10, Cormetech Letter 12/17/07, Page ID 4829. Cormetech advised that further testing was indicated. Throughout this period, Cormetech never informed B&W "that any of the interim testing demonstrated that the catalyst was at the end of its catalytic life guarantees." R. 115-18, Chitwood Aff. at ¶ 23, Page ID 5117. Instead, Cormetech assured B&W that it remained confident that the operational life warranty could be met.

Only in August 2008 was it made clear to B&W that Cormetech's corrective efforts would fall short. According to Project Manager Chitwood, B&W received "preliminary notice" of the full performance guarantee testing results by email on or about September 3, 2008. Formal notice came later by letter on September 26, 2008. This letter from KCP&L advised in pertinent part "that the SCR does not meet the warranties and Performance Guarantees specified in the Contract." R. 114-12, Cheatum Letter 9/26/08, Page ID 4860. The letter further advised that it was B&W's obligation under the contract "to conduct a root cause evaluation and generate a corrective action plan with KCP&L and catalyst manufacturer to determine mutually agreeable repairs or modifications to achieve the Performance Guarantee." *Id.*

B&W and Cormetech then undertook a root cause evaluation to determine why the catalyst failed to meet its expected life term. On February 7, 2009, B&W issued its Root Cause Analysis, summarizing its findings and conclusions. The Root Cause Analysis identified seven factors that contributed to the early deactivation of the catalyst, none of which was attributable to Cormetech: (1) burning fuels outside the specified range; (2) subjecting the catalyst to higher than specified ash loads; (3) failing to activate sonic horns that would have prevented ash build-up; (4) presence of severe tube leaks during operation; (5) continued operation of the SCR without removal of accumulated ash, after a shutdown on August 4, 2007; (6) continued operation of the SCR without removal of accumulated ash, after an outage on August 31, 2007, until April 2008; and (7) poor combustion, which led to increased ash loading and possible phosphorous poisoning.

After KCP&L determined in 2008 that the catalyst was at the end of its useful life, it contracted directly with Cormetech to obtain a replacement catalyst. The replacement catalyst also failed before the end of its expected life. Ultimately, the problem that caused the early deactivation of both the original and replacement catalyst appears to have been remedied by replacement of the cyclone burners in the power station's furnace. KCP&L asserted a claim against B&W based on the unsatisfactory performance of the SCR, which resulted in a $3.5 million meditation settlement.

B&W commenced this action against Cormetech in federal court based on the parties' diversity of citizenship on August 3, 2012. The original complaint was dismissed without

prejudice pursuant to the parties' tolling agreement while B&W pursued mediation with KCP&L.  After those efforts resulted in the settlement, B&W reinstituted the action on March 6, 2014, within the agreed tolling period, claiming recovery of the settlement amount from Cormetech based on breach-of-warranty and contractual indemnity theories.  The parties completed discovery, Cormetech moved for summary judgment, and the district court granted the motion, finding no triable fact issue on either of B&W's claims.  The court held the breach-of-warranty claim was time-barred and the indemnification claim failed for lack of evidence that B&W's losses resulted from a defect in goods or services purchased from Cormetech.

## II.  ANALYSIS

### A.  Standard of Review

The summary judgment ruling is reviewed de novo.  *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013).  Under Rule 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Smith*, 708 F.3d at 825.  Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact.  A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.  *Id*.  A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.  *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015).  "A factual dispute concerns a 'material' fact only if its resolution might affect the outcome of the suit under the governing substantive law"—in this case, Ohio law.  *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013).

### B.  Breach of Warranty Claim

B&W's first claim alleges that Cormetech expressly warranted that the catalyst furnished to B&W for the La Cygne Power Plant would operate "for a period not less than 36 months from initial operation or 24,000 of SCR system operating hours, whichever comes first."  R. 1,

Complaint at ¶ 19, Page ID 4–5. The claim further alleges that B&W learned on August 5, 2008 that the Cormetech catalyst had reached the end of its useful life after no more than 14 months of operation, in breach of the performance warranty. *Id.* at ¶¶ 20–21. The district court held this claim was for enforcement of a performance warranty in a contract for the sale of "a good," governed by Chapter 2 of the Uniform Commercial Code and is subject to the statute of limitations codified at Ohio R.C. § 1302.98. This conclusion is not contested on appeal.

The relevant statute provides in pertinent part:

(A) An action for breach of any contract for sale must be commenced *within four years after the cause of action has accrued*. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(B) *A cause of action accrues when the breach occurs*, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that *where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.*

(Emphasis added). Thus, the breach-of-warranty claim is subject to a four-year period of limitation, which began to run when B&W discovered or should have discovered that the warranty was breached.

The district court concluded as a matter of law that B&W should have discovered the performance warranty breach by October 2007 at the latest, when Cormetech informed B&W that test results showed a "higher than expected loss of catalytic potential." R. 114-9, Cormetech Ltr. 10/8/07 at 3, Page ID 4827. By then, the district court concluded, B&W "should have known that the catalyst would not meet its end of life guarantees." *See* R. 121, Opinion at 17–19, Page ID 5190–92. Because B&W did not commence action on the breach-of-warranty claim until August 2012, the claim was held to be time-barred, as the four-year limitations period had expired in October 2011.

There is no dispute that KCP&L, B&W, and Cormetech all knew there was a problem with operation of the SCR at the La Cygne Power Plant right from the beginning. Yet, B&W maintains it did not know the catalyst performance warranty would be breached until September

2008, when it received notice of the results of Cormetech's performance warranty testing, showing the catalyst was at the end of its operational life. At this point, B&W acknowledges, it had discovered that Cormetech's performance warranty would inevitably be breached, even though the catalyst remained functional and in service for a total of 17,000 hours and was not replaced by Cormetech until March 2009. B&W thus contends that the four-year period of limitation began to run at this point and its original complaint, filed on August 3, 2012, was timely filed.

In rejecting this position, the district court placed heavy emphasis on B&W's August 21, 2007 letter to Cormetech acknowledging that it had "reason to believe that the catalyst will not reach the end of life guarantees." However, this communication does not and could not reflect discovery that the future-performance warranty was or would inevitably be breached. Viewing the letter in light of the parties' contract and ensuing course of conduct, its import is clear. B&W was putting its contractual business partner, the catalyst manufacturer, on notice of a manifest problem as early as possible so that Cormetech could undertake its contractual responsibility to do exactly what it did: investigate, monitor, test, identify the problem, and take appropriate corrective action to *prevent* the *potential* performance breach. In rejecting this eminently reasonable construction of the letter, the district court appears to have viewed the evidence in the light most favorable to the movant Cormetech, rather than the non-movant B&W.

The district court also rejected B&W's contention that Cormetech's October 2007 correspondence justified its delay in deducing that the performance warranty would be breached. True, Cormetech's letter confirmed the earlier finding of "higher than expected loss of catalytic potential," but it did not advise that the catalyst was approaching the end of its useful life. Instead, it recommended continued monitoring and various testing approaches, in furtherance of correcting the problem and meeting the performance warranty.

It had become evident, after six months of operation, that unless effective corrective action was identified and taken, the catalyst would not meet its 24,000-hour operational life warranty. Yet, Cormetech had undertaken its contractual responsibility to monitor performance and identify what corrective "repairs or modifications" were necessary "to achieve Performance Guarantee." *See* R. 114-6, Catalyst Performance Guarantee Remedy Language Art. 2.1, Page ID

4812. In other words, in October 2007, the catalyst was not operating as expected, but had not yet experienced "catalyst life failure," such as would have triggered B&W's and Cormetech's contractual duty to "conduct a root cause failure evaluation" and develop "a corrective action plan." *Id.* at Art. 2.1, 3.2, Page ID 4812, 4815.

Still, Cormetech was actively investigating and attempting to identify appropriate corrective action to meet the catalyst's operational life guarantee. This understanding is substantiated by Jason Chitwood, B&W Project Manager, who attested that between the time of the initial performance guarantee testing in June 2007 and the full performance guarantee testing in August 2008, the SCR reactor continued to be "fully functional." R. 115-18, Chitwood Aff. at ¶¶ 19–24, Page ID 5113, 5116–17.

Inasmuch as the October 2007 letter showed that the problem persisted, but that the cause remained indeterminate, and that Cormetech was cooperating in good faith to help ensure the success of the contract, it would make little sense for the court to construe the letter most adversarily as putting B&W on notice of the need to institute or threaten litigation to protect its rights. Again, the district court appears to have given the benefit of reasonable inferences to Cormetech rather than to B&W.

The district court also cited the report of B&W's own expert, Dr. Stephen Niksa, dated July 27, 2015, as support for the proposition that B&W should have known in August or October 2007 that the catalyst would not meet its end of life guarantees. The Niksa report is not oriented toward ascertaining what B&W knew and when. Rather, Niksa was hired by B&W to render expert opinions, as a chemical engineer, on the technical basis for B&W's claims that Cormetech breached the contractual warranty and indemnity provisions. R. 114-17, Niksa Report at 1, Page ID 4900. Hence, Niksa's report is oriented toward showing what *Cormetech* knew and when, for purposes of evaluating the suitability of Cormetech's design of the catalyst for its intended purpose. To explain his opinions on Cormetech's liability, Niksa referred to the testing results collected during the investigation of the catalyst's performance deficiencies. The district court quoted some of these references accurately, but out of context. That is, the district court took advantage of Niksa's hindsight in 2015, to conclude as a matter of law that *B&W* "should have

known," in the Fall of 2007, not that the performance warranty *was* breached, but that it likely *would* be breached at some indeterminate future date.

Yet, a breach-of-performance-warranty claim accrues under Ohio R.C. § 1302.98(B) when the *breach* of the warranty—not the possibility or likelihood of breach—was or should have been discovered. Even with the benefit of crystal clear hindsight, it is beyond peradventure that no breach of the performance warranty had occurred in October 2007. The catalyst continued to be operational for more than a year thereafter. Again, in October 2007, there simply was no breach that could or should have been discovered by B&W. Suffice it to say that the district court's reliance on the Niksa report to conclude there was no genuine dispute as to when B&W discovered or should have discovered the performance warranty breach is far from persuasive.

To support its determination of B&W's claim accrual, the district court cited one case, *Miles v. Kohli & Kaliher Assoc., Ltd.*, 917 F.2d 235, 239, 256 (6th Cir. 1990). *Miles* is clearly distinguishable. In *Miles*, the court addressed several wrongful death claims by estates of motorists who lost their lives when a bridge collapsed. United States Steel Corporation ("US Steel") was one of several defendants who played a role in the bridge construction. US Steel had fabricated the "bridge kit," consisting of interlocking sections of corrugated steel plates designed for assembling into an arch and culvert. *Id*. at 238. Defendant Paulding County used the kit to construct the culvert. Two years after completion, inspection of the culvert raised questions. The US Steel project manager identified signs of "prior subsidence of the backfill" and advised the County that it could lead to collapse of the structure. *Id*. at 239. He recommended close monitoring and, if continued movement of the arch was observed, then replacement of the backfill material around the culvert.

Unfortunately, the County did not maintain close monitoring and the culvert collapsed before repairs could be made. The County sued US Steel for tortious breach of express warranty but the court held that the County should have discovered the breach of that warranty when the US Steel project manager "*correctly identified the nature of the problem and communicated his findings* to the appropriate County authority." *Id.* at 256 (emphasis added). The County's claim was asserted more than four years after this accrual date and was held to be time-barred.

Here, in contrast, Cormetech, the party that undertook investigation of the problem, cannot be said, as a matter of law, to have correctly identified and communicated the nature of the catalyst problem in such a way as to make it apparent to B&W in the Fall of 2007 that the performance warranty was or inevitably would be breached. Rather, the evidence shows that Cormetech's testing results and corrective investigations remained inconclusive during the period August 2007 to August 2008. Cormetech did not advise B&W that the operational life warranty would not be met despite its efforts; instead, it continued to assure B&W that its corrective measures could prevent a breach . . . until August or September 2008. Only then did Cormetech's Performance Test Report disclose that "[a] Catalyst action is required to maintain the design performance level of the SCR." R. 114-11, Performance Test Report at 20, Page ID 4851. And at that time, and KCP&L gave B&W notice that this amounted to a "catalyst life failure" under the terms of the performance warranty that necessitated a corrective action plan.

Cormetech has the burden of establishing its statute of limitations defense, *see Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013), but has failed to show that there is no genuine dispute about the date of accrual of the breach-of-performance-warranty. This conclusion is supported by other rulings relied on by B&W. *See, e.g., Controlled Environments Const., Inc. v. Key Industrial Refrigeration Co.*, 670 N.W.2d 771, 782–85 (Neb. 2003) (addressing discovery-of-breach accrual for breach of future-performance warranty under UCC and holding that ambiguity in the record made out question of fact requiring reversal of summary judgment ruling); *Anderson v. Crestliner, Inc.*, 564 N.W.2d 218, 222–23 (Minn. Ct. App. 1997) (reversing lower court's dismissal and holding future-performance warranty breach did not occur when defect was first discovered, but when defendant manufacturer advised plaintiff that it would not honor warranty). The case law cited by Cormetech is plainly inapposite; none of the cases cited deal with "discovery" accrual of a claim for breach of a future-performance warranty under the UCC statute of limitations.

Accordingly, viewing the record in the light most favorable to B&W and giving B&W the benefit of all reasonable inferences, it is apparent, for the reasons set forth above, that there are *at least* genuine fact questions concerning when B&W should be deemed to have discovered that Cormetech was in breach of the operational life warranty. In emphasizing evidence of

B&W's knowledge of a problem with the catalyst in the Fall of 2007, and disregarding evidence tending to explain why B&W reasonably did not consider such knowledge notice that the performance warranty was or necessarily would be breached, the district court overstepped its bounds. It impermissibly engaged in "weighing the evidence" and assessing "the truth of the matter." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The award of summary judgment on the breach-of-warranty claim must therefore be vacated.

## C. Indemnity Claim

In its second claim, B&W seeks enforcement of Cormetech's contractual promise to indemnify B&W against all losses arising out of any defect in the goods or services, i.e., the $3.5 million loss B&W sustained in settling the matter with KCP&L. The district court granted Cormetech summary judgment on this claim based on its holding that B&W had presented insufficient evidence that Cormetech committed "any act or omission" that would support indemnification. Rather, the court observed that B&W's Root Cause Failure Evaluation showed the early deactivation of the catalyst was due to "operating issues at KCP&L's plant." R. 121, Opinion at 22–23, Page ID 5195–96. Indeed, the court noted that the Root Cause Report, prepared by B&W's Project Manager Jason Chitwood on February 27, 2009, identified "seven factors that contributed to the early deactivation of the catalyst, none of which is attributable to Cormetech." *Id.* at 5, Page ID 5178.

However, B&W cited other evidence of Cormetech's fault. First, in his 2015 deposition, Chitwood affirmed the conclusions reached in the Root Cause Report. When asked if he believed there was any other contributing factor he could attribute to Cormetech, Chitwood implied that Cormetech may have been at fault for not accounting for the potential for phosphorous poisoning in its design of the catalyst, but he conceded that he "didn't know how they formulate it." R. 115-6, Chitwood Dep. at 187, Page ID 5086.

In addition, Mark Low testified in deposition that poor combustion at the La Cygne Power Plant resulted in increased ash loading and the presence of gaseous phosphorous, which contributed to early deactivation. This was consistent with the seventh contributing factor identified by Chitwood in the Root Cause Report, but Low said the impact of phosphorous

poisoning received more focus only after the even larger replacement catalyst provided by Cormetech to KCP&L in March 2009 deactivated almost as quickly as the first. This led Low to believe that Cormetech's design or "formulation" of the catalyst "probably wasn't optimum for the conditions that were specified." R. 115-14, Low Dep. at 99–101, Page ID 5064. Asked to quantify the relative contributions of KCP&L's operation mistakes and Cormetech's alleged design defect, Low offered that the design defect may have been 95% responsible for the early deactivation.

John Monacelli, another B&W employee, also testified in deposition that gaseous phosphorous played a significant contributing role in the deactivation of the catalyst, a factor Cormetech did not anticipate.

The district court dismissed all three of these sources as unreliable statements by B&W employees who "reasoned backwards from the fact that the catalyst failed earlier than expected to engage in rank speculation that the catalyst may not have been formulated properly." R. 121, Opinion at 23, Page ID 5196. Further, the court noted that their speculation was "entirely negated" by the testimony of B&W's own expert Stephen Niksa. *Id.* at 24, Page ID 5197. The court noted that Niksa's *report* corroborated their "speculation" by concluding that phosphorous poisoning was the cause of the early deactivation and that Cormetech's failure to recognize this potential was an oversight. In his *deposition*, however, Niksa was unable to identify a defect in the catalyst and the court viewed Niksa's testimony as contradicting his report.

The deposition testimony of Chitwood, Low, and Monacelli stating their opinions about Cormetech's failure to formulate a suitable catalyst, albeit not compelling, is some evidence. Granted, their opinions are not well supported and are informed by hindsight that compromises the value of their assessment of what Cormetech ought to have known and done in 2006–07, when the catalyst design was formulated. Still, the district court's outright dismissal of their opinions as nothing but "rank speculation" is unwarranted at this stage.

Moreover, their opinions are buttressed by the evidence principally relied on by B&W to make out its "omission" case, the report of engineering expert Dr. Stephen Niksa:

By failing to properly account for the potential for P poisoning in its catalyst design for the La Cygne SCR, despite a clear warning in the remarkably high LOI [loss on ignition] levels from this furnace, Cormetech installed catalyst that was unfit for this SCR, and therefore had no chance to meet contract specifications.

R. 114-17, Niksa Report at 13, Page ID 4912. Based on his report, B&W contends that even though Cormetech's catalyst proposal and management plan recognized the potential for chemical deactivation by calcium and phosphorous, and even though B&W's specifications signaled a high potential for phosphorous poisoning, Cormetech accounted only for the calcium masking potential and not for the phosphorous poisoning potential. This failure to account for the potential phosphorous poisoning is said to represent an omission that resulted in the installation of an unfit catalyst and was the reason for its premature deactivation. *Id*. at 10–13, Page ID 4909–12.

Right or wrong, Niksa's technical opinion facially represents strong support for B&W's claim. But the district court effectively disregarded the conclusion reached in Niksa's report as undermined by his own deposition testimony given two months later. Again, the district court's manifest error is in having viewed B&W's evidence with a skeptical eye rather than an accepting eye. The court engaged in a weighing of the evidence that is impermissible at the summary judgment stage. The district court has identified weaknesses in B&W's case, but we cannot agree that B&W's evidence amounts to no more than a mere scintilla or a mere showing of "metaphysical doubt." On viewing the evidence in the light most favorable to B&W, as we must, we cannot but conclude that there is a genuine issue for the fact finder as to whether Cormetech's failure to anticipate the risk of phosphorous poisoning when it designed the catalyst was a cognizable "omission" warranting indemnification under the contract.

Accordingly, the district court's award of summary judgment to Cormetech on the indemnity claim must also be vacated.

## III. CONCLUSION

In sum, both of B&W's claims of error are sustained. The summary judgment rulings on both of its claims against Cormetech are **VACATED** and the case is **REMANDED** to the district court for further proceedings not inconsistent with this opinion.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

KETHLEDGE, Circuit Judge, concurring in part and concurring in the judgment. A cause of action cannot accrue (in the sense of come into existence) before one of its elements does. And an element of a claim for breach of warranty is not merely anticipation of a breach, but the breach itself. The limitations period for a breach of warranty claim therefore cannot begin to run—much less run out—before the breach occurs. That is true regardless of whether the parties could have anticipated the breach before it actually happened.

The relevant limitations provision in Chapter 2 of the Uniform Commercial Code, namely Ohio R.C. § 1302.98, only confirms these truths. That provision states that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued[,]" and that "a cause of action accrues when the breach occurs[.]" Ohio R.C. § 1302.98(A), (B). Thus, the limitations period for a breach of contract claim begins to run only when the breach occurs, and not before.

The confusion in this case seems to arise from a discovery rule applicable to certain breach of warranty claims, namely that "the cause of action accrues when the breach is or should have been discovered." Ohio R.C. § 1302.98(B). But this rule serves only to lengthen rather than shorten the time for bringing suit. Specifically, under this rule, the claim accrues not when the plaintiff discovers or should have discovered the likelihood—or even the "inevitabl[e]" likelihood, Op. at 10—of some future breach. Instead, the claim accrues when the plaintiff discovers or should have discovered "*the breach*" itself. Ohio R.C. § 1302.98(B) (emphasis added); *see also* Ohio R.C. § 1302.27 cmt. n.13 ("[i]n an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty *but the fact that the warranty was broken* and that the breach of the warranty was the proximate cause of the loss sustained") (emphasis added). And in addition to that textual point, there is the practical one that in most cases a plaintiff cannot possibly calculate its damages until it knows when, exactly, the breach occurred. For only then can the plaintiff know the extent of the breach, *i.e.*, the amount of time that the product was warranted to perform in a certain way but did not. Hence the discovery rule

of § 1302.98(B) can only *postpone* the date of the claim's accrual—and thus the date on which the claim's limitations period begins to run—from the date of the breach, to the date on which the breach was or should have been discovered.

Here, Cormetech warranted that its catalyst would perform in a certain manner (by removing at least 92% of the NOx from the plant's flue gas and by limiting ammonia slip to an average of 2 ppm, among other things) for a certain minimum period of time (24,000 hours). That warranty was not breached until the catalyst did not, in fact, perform as warranted during that minimum period of time. On August 5, 2008, B&W discovered that the catalyst was not performing as warranted, because ammonia slip was then averaging ten ppm rather than two. Nobody suggests that B&W should have discovered that (actual) breach any sooner. Per the discovery rule of Ohio R.C. § 1302.98(B), therefore, B&W's claim accrued on August 5, 2008. B&W filed suit less than four years later. Its claim was therefore timely.

I therefore join the Court's thoughtful opinion except to the extent it suggests that a claim for breach of warranty could accrue when a plaintiff knows or should have known that the warranty "inevitably would be breached[,]" Op. at 10, rather than at the time of the breach itself—or even later, as set forth in § 1302.98(B).

––––––––––––––––––––––––––––––––––––––––––––––––

**CONCURRING IN PART AND DISSENTING IN PART**

––––––––––––––––––––––––––––––––––––––––––––––––

GRIFFIN, Circuit Judge, concurring in part and dissenting in part. I agree that the district court erred in granting summary judgment in Cormetech's favor on the breach of warranty claim, but disagree regarding the indemnity claim. I therefore respectfully concur in part and dissent in part.

In finding a genuine dispute of material fact regarding the indemnification claim, the lead opinion relies upon unsubstantiated and inadmissible opinions of three B&W employees. I disagree that we should elevate their testimony to something above pure speculation. All three made clear that while they believed the catalyst's formulation was incorrect, they had no foundation for this belief.

In particular, Mark Low concluded "that the formulation probably wasn't optimum for the conditions" due to the catalyst's "rapid deactivation." However, when asked to provide the basis for his conclusion, he was unable to do so—he admitted he did not "have any idea what the problem [was] with the formulation" and was not "aware of anybody within B&W who has any evidence that there was a problem with the formulation." When directly confronted with why he thought "the catalyst was [not] fit for the conditions that it was actually designed for," Low offered this equivocal non-answer:

> Yeah, I think that, you know, no direct evidence at this point in time, but I believe that things were -- you know, I don't know. I don't have any direct evidence I guess is the right answer. . . .

To the extent Low assigned a "percentage of responsibility" for the alleged design defect, he qualified his speculative opinion as follows: "I don't have any fact to tell you or specific analysis that could be done to say this is exactly the percentage of why the catalyst failed." Finally, Low conceded he became focused on the formulation *after* Cormetech's larger, replacement catalyst also failed.

John Monacelli's testimony was likewise conclusory and without a factual basis. Monacelli's opinion was that the catalyst's design was defective because it failed. Beyond that, he admitted he had no knowledge of the catalyst's formulation; rather, "[t]hat's Cormetech's area of expertise and we do not know that." Monacelli later reiterated on his lack of knowledge and expertise:

> Q: Was there something that you now believe, looking back, that Cormetech should have done differently with respect to this project?
>
> A. I have an opinion, but I don't know if it's factual, but -- and it's because they're the experts, I can't answer for them, but was the formulation of this catalyst done correctly, and I have no insight into that and it can even be in hindsight was it done correctly.

It is true that Cormetech did not anticipate high levels of phosphorous gas at the La Cygne plant, but as Monacelli testified, neither did B&W. Jason Chitwood's testimony confirms this, faulting the catalyst's design for failing to anticipate high phosphorous levels, but admitting B&W did not anticipate such high levels either. When asked to explain this discrepancy, Chitwood deferred to Cormetech's expertise in the area.

In short, none of their opinions are supported by reference to facts and all are informed by hindsight. That is, their opinions about Cormetech's failure to properly account for phosphorous poisoning were informed by knowledge that Cormetech's even larger replacement catalyst had also failed. I therefore agree with the district court's conclusion that this hindsight-informed, speculative testimony is insufficient to create a genuine dispute of material fact for trial. *See Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

Second, the lead opinion "buttresses" this speculative testimony with the opinion of B&W's expert, Dr. Stephen Niksa. But the lead opinion fails to put this in context. In his deposition, Dr. Niksa characterized the experience of "watching the replacement catalyst deactivate at the same rate" as the first as "extraordinary." This experience, he said, made it clear that none of the other contributing factors that had been considered "would make a[] difference." When asked specifically what that experience should have taught Cormetech about how it should have designed the catalyst differently, Niksa responded:

> By throwing up a flag saying that given the potential for phosphorous deactivation in this application, no catalyst is going to work. That's what they should have done. That's exactly what they should have done.

In other words, Niksa, like the B&W employees, was unable to identify a defect in the catalyst that was the product of any omission or oversight by Cormetech until *after* the "extraordinary" event of the replacement catalyst failure. Then, it became apparent that the problem was not in the catalyst, but in the conditions of the La Cygne plant. And indeed, the problem seems to have been resolved; not by any change in the catalyst design or formulation, but by replacement of the cyclone burners, as freely acknowledged by Niksa in his report: "P[hosphorous] poisoning could only be alleviated by replacing the cyclone burners."

Cormetech formulated the catalyst in 2006, but the evidence relied upon by the lead opinion to find a factual dispute in the form of phosphorous problems comes several years later. Before the replacement catalyst failure, B&W's position was that the original catalyst failure was not attributable to any fault of Cormetech, but rather to various contributing factors related to KCP&L's operation of the SCR. Cormetech's Performance Test Report in 2008 follows, giving no hint of suspicion that phosphorous poisoning resulting from poor combustion was a cause of the catalyst failure—even as Cormetech prepared to supply a replacement catalyst. Viewing B&W's evidence in this context, I disagree with the lead opinion that B&W put forth sufficient evidence of a genuine dispute of material fact as to whether Cormetech's failure to anticipate the risk of phosphorous poisoning when it designed the catalyst was a cognizable "omission" warranting indemnification under the contract.

Accordingly, I would affirm the district court's grant of summary judgment in Cormetech's favor on the indemnity claim. I join the lead opinion in all other respects.